**Robert Earl McILWAIN, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 39566.**

Court of Criminal Appeals of Texas.

May 18, 1966.

George S. McCarthy, Amarillo, for appellant.

Dee D. Miller, Dist. Atty., John W. Broadfoot, Asst. Dist. Atty., Amarillo, and Leon B. Douglas, State's Atty., Austin, for the State.

WOODLEY, Judge.

The offense is murder; the punishment, death.

The badly decomposed body of Sergeant Robert John Roeske was found in a locker of his room in Barracks 3419 at the Amarillo Air Force Base on July 6, 1965.

Evidence was offered showing that his death was caused by choking and strangulation with a necktie, as alleged in the indictment.

A written confession of appellant, made to Detective Lieutenant Charles Hollis of the Amarillo Police Department on the night of July 15, 1965, was admitted in evidence following a hearing before the court in the jury's absence.

At the hearing, appellant testified and elicited from Lieutenant Hollis and other officers testimony to the effect that upon being advised of his right to an attorney he asked to use the telephone to call Mr. Miller, at the Worth Hotel, appellant's testimony being that he wanted to call Miller so that he could call an attorney.

The trial judge disposed of the issue of denial of the right to counsel in his ruling at the conclusion of the hearing:

"In my opinion this statement is admissible. The indications are that the man knew that he was wanted by the police, and had opportunity at that time to arrange for an attorney; was alone in a room with a telephone, by his own admission for some hour or so, and had opportunity at that time to use it if he wanted to. I see no indication of any merit whatever in any contention that the statement is not admissible. The Reporter will enter this as the order and finding of the Court in this case. The confession will be admitted."

Appellant further testified at the hearing before the court that prior to making the statement he talked to Captain Wynne in a back room in the Petroleum Building for at least an hour and a half, and Capt. Wynne gave him two polygraph tests; that after the first test Capt. Wynne told him he was lying. Appellant also testified:

"Q. Did he say anything to you with reference to making a statement, or signing a statement?

"A. Yes, he did.

"Q. What did he say?

"A. He first asked me questions about whether I would rather be shot by a gun—

"Q. Questions about what?

"A. About the way I wanted to die, if I had to die,—by the electric chair, the gas chamber, with a gun, or something like that. He told me I could make a statement and that it would be easier on me.

"Q. If you made a statement?

"A. Yes, sir.

"Q. What if anything did he say, if you didn't make a statement?

"A. He said that if I didn't make a statement that he would request the death penalty.

"Q. Did you know he was a police officer at that time?

"A. No, I thought he was just a regular civilian.

"Q. Did he ever identify himself as to what he was or who he was?

"A. No, he didn't.

"Q. Did anyone else?

"A. Not that I know of.

"Q. When did you first learn he was a captain with the police?

"A. I think I learned the following day who he was, on the morning of the 16th.

   *    *    *    *    *    *

"Q. And do I understand that Captain Wynne told you that if you made a statement it would be easier for you?

"A. Yes, sir.

"Q. And if you didn't, he asked you how you wanted to die?

"A. Yes, sir.

"Q. That's all."

Captain Wynne was not called to testify.

■ The state contends that appellant's testimony is contradicted by the testimony of Lt. Hollis after the hearing in the jury's absence that appellant "wasn't mistreated in any way." We do not agree.

In his testimony before the court Lt. Hollis testified that he left Captain Wynne's office about 10:30 and later returned and took the statement, and testified:

"Q. Did Prather ever leave Captain Wynne's office?

"A. Yes, sir.

"Q. With you?

"A. Yes, sir.

"Q. Who remained there when you and Prather left?

"A. Captain Wynne, Captain Nicholson; the two OSI Agents, and the defendant—I don't know, there may have been some news men there, at the time.

   *    *    *    *    *    *

"Q. Captain Wynne operates a commercial polygraph concern there, does he not?

"A. Yes, sir.

   *    *    *    *    *    *

"Q. Do you know whether or not the defendant was interrogated by Captain Wynne, privately, outside of your presence, in his private office, where the polygraph machine is?

"A. I am sure he was interrogated outside of my presence.

"Q. There in the Petroleum Building?

"A. Yes, sir."

■ Assuming, however, that an issue of fact was raised as to whether Police Captain Wynne made the statements attributed to him by appellant, it is clear that such fact issue was not resolved by the trial court as required. See Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908; Lopez v. State, Tex.Cr.App., 384 S.W.2d 345; Harris v. State, Tex.Cr.App., 384 S.W.2d 349; Dixon v. State, Tex.Cr.App., 383 S.W. 2d 928.

The record reflects the following:

"Mr. McCarthy: I presume that the Court will at some time prepare a statement of facts with reference to this?

 

"The Court: The Statement of Facts speaks for itself. I make findings only as to conclusions of law.

"Mr. McCarthy: Note our exception."

The judgment is reversed and the cause remanded.